*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re AMBRIS/HERNANDEZ, Minors.

UNPUBLISHED
January 15, 2019

No. 344459
Oakland Circuit Court
Family Division
LC No. 2017-850545-NA

Before: LETICA, P.J., and CAVANAGH and METER, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to her minor children, AA and SH, pursuant to MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), and (k)(*iii*). Because we conclude that there are no errors warranting relief, we affirm.

In January 2017, the then 20-year-old respondent-mother and her then-fiancé, respondent-father, were living together with their newborn son, SH, and respondent-mother's one-year-old son, AA. On the morning of January 26, 2017, the family's pediatrician, Dr. Ram, performed a routine one-month well-baby examination of SH. During the examination, Dr. Ram manipulated SH's limbs and performed a maneuver intended to confirm that the hip and thighbones were intact. Dr. Ram did not notice any injury to SH's legs. Specifically, there was no swelling, inflammation, redness, or bruising to the right leg. Consistent with Dr. Ram's findings, respondents did not report any concerns with SH's legs. SH received a Hepatitis B immunization during the examination. According to the medical records and Dr. Ram's testimony, the vaccination was administered in SH's *left* leg. Dr. Ram advised respondents that there might be some minor swelling caused by the vaccination. At the conclusion of the routine examination, Dr. Ram requested that SH return in one week and an appointment was scheduled for February 3, 2017. Dr. Ram was concerned that SH was failing to thrive and he wanted to assess SH's weight gain.

After the routine doctor's visit, respondent-mother stopped by the home of the maternal grandmother. During this visit, the maternal-grandmother changed SH's diaper. The maternal-grandmother later recalled that SH had a bandage on his right leg and the leg looked a little swollen. On the evening of Friday, January 27, 2017, the maternal great-grandmother stopped

by respondents' home for a visit. During a diaper change that she performed, the maternal great-grandmother did not notice any swelling, redness, or bruising on SH's legs.

Later on Friday, January 27, 2017, SH was placed in the care of his paternal grandmother. The paternal grandmother was to care for the baby over the weekend while respondent-mother attended high school equivalency classes. The paternal grandmother noticed that SH was running a fever, crying, and a little fussy. She gave SH "drops" and held him in her arms until he fell asleep. The paternal grandmother then placed SH in a bassinette and checked on him throughout the night. Because her trailer home was dark and poorly lit, the paternal grandmother did not notice any swelling or redness in SH's right leg. However, while giving SH a bath on the following morning, the paternal grandmother noticed that SH's right leg was swollen and he would not straighten it out. At about 10:00 a.m., the paternal grandmother called respondent-father to report the swelling and suggest that the child should be seen by a doctor. On the afternoon of Sunday, January 29, 2017, SH was returned to respondents' care.

In the early morning hours of February 2, 2017—approximately six days after the swelling was first noted—respondents took SH to the emergency room at Providence Park Hospital. They had noticed that SH was not moving his leg much. No x-rays were done at that time. SH was diagnosed as suffering from a muscle spasm or a strain. Respondents were advised to massage SH's leg.

On February 3, 2017, Dr. Ram received a copy of SH's records from the examination in the emergency room. After reviewing the records and noting that SH had missed the previously scheduled follow-up appointment for the failure to thrive concerns, Dr. Ram directed his staff to contact respondents and, as a result, the follow-up appointment was rescheduled for February 6, 2017. When respondents brought SH to Dr. Ram's office on February 6, 2017, respondent-mother reported that SH was not moving his leg. SH was crying and in distress. Because he was concerned that SH had either a fracture or an infection, Dr. Ram ordered x-rays. These x-rays revealed a healing fracture of the right femur. Additional x-rays performed a few hours later at C.S. Mott Children's Hospital revealed a healing left, 10th posterior rib fracture.

SH's injuries precipitated an investigation by Children's Protective Services ("CPS") for suspected child abuse. Apart from his recent vaccination, neither respondent was able to provide an explanation of SH's injures. Shortly after beginning its investigation, petitioner filed a petition requesting termination of both respondents' parental rights at the initial dispositional hearing. At the conclusion of a five-day hearing, the court determined that it could take jurisdiction over the two children. It then found that there existed clear and convincing evidence to terminate respondents' parental rights pursuant to MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), and (k)(*iii*). After a best-interest hearing held several months later, the court concluded that a preponderance of the evidence established that termination of respondent-mother's parental

rights was in the children's best interests. Accordingly, the court entered an order terminating respondent-mother's parental rights to AA and SH.[1] This appeal then followed.

Respondent-mother first argues that the trial court erred when it found that statutory grounds existed for the termination of her parental rights. We disagree. In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

The court terminated respondent-mother's parental rights to her two children pursuant to MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), and (k)(*iii*). At the time the trial court entered its order, these statutory provisions permitted termination of parental rights under the following circumstances:

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:
>
> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.
>
> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[2]

---

[1] By this same order, the trial court also terminated the parental rights of respondent-father to his son SH. Respondent-father, however, is not a party to this appeal.

[2] The statute was amended by 2018 PA 58, effective June 12, 2018. Subsection (g), as amended, now provides:

> The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

(k) The parent abused the child or a sibling of the child and the abuse included 1 or more of the following:[3]

* * *

(*iii*) Battering, torture, or other severe physical abuse.

After reviewing the record, we conclude that the trial court did not clearly err when it terminated respondent-mother's parental rights under these statutory grounds. The evidence established that six-week-old SH sustained severe physical injuries: a complete break, not simply a hairline fracture, of the femur and a fractured rib. All of the medical experts agreed that it would have taken a significant amount of direct force to the femur to precipitate a complete break. Similarly, they also agreed that the rib fracture, which was located near the backbone, was caused by a squeezing mechanism and highly suspicious for abuse. Further, respondent-mother's expert witness, Dr. DeGraw, acknowledged that SH would have been in a great deal of pain at the time of injury and it would have been obvious to the perpetrator that the infant had been injured. The medical experts also ruled out accidental injury, a metabolic condition, or the actions of a 14-month-old sibling as the cause of the fractures. Consequently, the overwhelming and credible evidence confirms that SH was the victim of abuse, and it concurrently refutes the suggestion that SH's injuries could have been self-inflicted or accidental.

Further, the evidence was sufficient for the court to conclude that either or both of respondents physically abused SH or otherwise failed to protect the child. The trial court found that SH was injured while in respondents' exclusive control. Specifically, the court determined that the abuse must have occurred sometime after the routine well-baby check-up on January 26, 2017, but before SH was delivered to the care of his paternal grandmother on the evening of

---

expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

[3] As amended by 2018 PA 58, effective June 12, 2018, the introductory portion of Subsection (k) now provides:

The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent . . . .

January 27, 2017. This finding was, in this Court's opinion, also supported by clear and convincing evidence.[4]

SH's treating physician and respondent-mother's expert both concluded that when the femur fracture was finally discovered on February 6, 2017, the injury was likely 10 to 14 days old. Therefore, it should initially be noted that the trial court's conclusion that the injury occurred sometime between January 26 and January 27, 2017, falls within the range identified by the medical experts. Moreover, there was no evidence that SH exhibited any symptoms of a leg injury before January 26, 2017. At the time of the well-baby check-up on the morning of January 26, 2017, SH's pediatrician performed typical maneuvers in an effort to reveal any abnormalities to the hips and legs. Dr. Ram testified that he fully articulated SH's limbs and discerned no problems or concerns. Consistent with Dr. Ram's findings, Dr. DeGraw eventually admitted that it was reasonable to conclude that the fractures were not present at the time of the January 26, 2017 well-baby examination by Dr. Ram.

There was also clear and convincing evidence that SH's femur was already fractured when he was placed in the care of the paternal grandmother on the evening of January 27, 2017. The paternal grandmother testified that when SH arrived at her home, he was fussy and crying. While she did not notice any redness or swelling of the limb until the next morning, it is clear that the swelling was present the previous evening. This is borne out by the paternal grandmother's testimony that when she contacted respondent-father on Saturday, January 28, 2017, and reported the swelling, he was not surprised by the information. In fact, respondent-father indicated that he had noticed the same thing and attributed the swelling to the vaccination. When SH was returned to respondents' care on Sunday, January 29, 2017, respondent-father commented that the swelling appeared worse than when SH was left with the paternal grandmother on Friday night. From this evidence, the trial court could have reasonably concluded that SH had already sustained the femur fracture when he was placed in the paternal grandmother's care.

Not only did the evidence support a finding that the fracture occurred while SH was in respondents' exclusive care, there was clear and convincing evidence that respondents waited six days after signs of injury to seek medical care for SH. The paternal grandmother advised respondents on Saturday, January 28, 2017, of her concerns, but they waited until February 2, 2017, to first seek medical care. Indeed, respondent-mother admitted that she took SH to the

---

[4] It should be noted that it was not necessary for the evidence to conclusively establish which respondent perpetrated the physical abuse. In *In re Ellis*, 294 Mich App 30, 35-36; 817 NW2d 111 (2011), this Court held that "termination of parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*iii*) is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent or respondents must have either caused or failed to prevent the child's injuries." In *In re Ellis*, the Court reasoned that "[w]hen there is severe injury to an infant, it does not matter whether respondents committed the abuse at all, because under these circumstances there was clear and convincing evidence that they did not provide proper care." *Id*. at 33.

emergency room only after the paternal grandmother insisted. While the doctors on that day missed the fracture, this does not excuse respondent-mother's delay in seeking treatment.

The evidence also supports the court's finding that the children would suffer from injury or abuse in the foreseeable future if placed in respondent-mother's home. Before the 2017 events, respondent-mother was investigated in 2016 for allegations that she abused AA. While CPS did not specifically substantiate the 2016 complaint, there was credible testimony by an eyewitness that respondent-mother became frustrated with AA's crying, removed his diaper, and struck him several times on the buttocks. There was also similar testimony that she slapped and shook AA out of frustration. After these 2016 events, respondent-mother was offered some services. Only eight months later, respondent-mother was again being investigated for abuse. The 2017 allegations involved an escalation in the severity of the abuse, as SH was found to have suffered fractures of both the femur and rib. Respondent-mother was unable to provide a plausible explanation for these injures. Indeed, she failed to take any responsibility for SH's injuries, denied any knowledge of the manner in which they were sustained, and persisted in positing implausible explanations for the severe abuse. Moreover, she waited six days before seeking medical care after it must have been obvious that SH had been injured. Because the evidence supported a finding that respondent-mother failed to protect her child and she continued to deny knowledge of the source the injuries, there existed a reasonable likelihood that the children would suffer further harm in respondent-mother's care.

Based on the foregoing, there was clear and convincing evidence to terminate respondent-mother's parental rights to the two children pursuant to MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), and (k)(*iii*).

Next, respondent-mother challenges the trial court's finding that termination of her parental rights was in the children's best interests. "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). Whether termination of parental rights is in the child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in the child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App at 131.

The trial court did not clearly err when it found that termination of respondent-mother's parental rights was in the best interests of the minor children. At the time of the termination hearing, SH and AA had been in care for 15 months. The evidence established that SH had been the victim of severe physical abuse. The evidence further demonstrated that respondent-mother

had a difficult time controlling her emotions and that she had been seen taking her frustrations out on her oldest child physically. Respondent-mother lacked insight into the manner in which her conduct contributed to the children being removed from her care. She failed to take any responsibility for SH's injuries. Indeed, respondent-mother did not truly appreciate the significance of the events as evidenced by the fact that one of her stated goals was to get her record expunged, get her children returned, and then open her own child or senior daycare.

While an evaluating psychologist agreed that respondent-mother could benefit from services and might safely parent the children one day, there was little to no evidence that respondent-mother was willing to actually make the necessary effort. Indeed, the examining psychologist declined to speculate on a timeframe within which respondent-mother would meaningfully engage in treatment. He did, however, note that respondent-mother had not fully engaged in the services that were offered to her during the pendency of the matter. While respondent-mother did attend parenting classes, the psychologist noted that she did not appear to benefit from them. Further, respondent-mother began life skills classes but did not complete them because she did not feel she was benefiting from them, and she ignored a recommendation to participate in counseling because she did not have enough time. Thus, while there may have been some evidence that respondent-mother might benefit from a treatment plan, there was insufficient evidence that she would do so within a reasonable time considering the children's young ages.

The court noted that the children were bonded with respondent-mother and living with a relative, but concluded that these factors did not outweigh the children's need for permanence, stability, and particularly, safety. Although placement with a relative weighs against termination, and the fact that a child is living with relatives must be considered, a trial court may terminate parental rights in lieu of placement with a relative if it finds that termination is in the child's best interests. *In re Olive/Metts Minors*, 297 Mich App at 43. Similarly, a trial court is not required to establish a guardianship if it is not in the child's best interests to so. See *In re Mason*, 486 Mich 142, 168-169; 782 NW2d 747 (2010). In this case, the minor children were still very young at the time of the termination hearing; AA was 2½ years old and SH was not yet 1½ years old. The maternal grandmother was open to adoption. By contrast, guardianship was not a viable option because it would not provide the permanency and finality that the children required. Termination of parental rights, which would pave the way for adoption, was a preferable permanency path for both children. Accordingly, the trial court did not clearly err when it determined that termination of respondent-mother's parental rights was in the children's best interests. These children were entitled to stability, permanency, and finality in order to foster their continued growth and development.

Affirmed.

/s/ Anica Letica
/s/ Mark J. Cavanagh
/s/ Patrick M. Meter